## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

RICHARD GILLIAM[1]                                             PLAINTIFF
ADC #177621

V.                          No. 4:19-CV-356-JM-JTR

JOHN STALEY, Sheriff, Lonoke County;
KEVIN MCCOY, Chief Deputy,
Lonoke County Sheriff's Department;
MATTHEW HODGE, Administrator,
Lonoke County Jail; DEAN WHITE,
Detective, Lonoke County Sheriff's Department;
IRVING, Deputy; and STEFFEN, Deputy            DEFENDANTS

## <u>RECOMMENDED DISPOSITION</u>

The following Recommended Disposition has been sent to Chief United

States District Judge James M. Moody Jr. You may file written objections to all or

part of this Recommendation. If you do so, those objections must: (1) specifically

explain the factual and/or legal basis for your objection; and (2) be received by the

Clerk of this Court within fourteen (14) days of the date of this Recommendation. If

you do not file objections, Judge Moody may adopt this Recommendation without

independently reviewing all of the evidence in the record. By not objecting, you may

waive the right to appeal questions of fact.

---

[1] The Clerk's office is directed to update the docket sheet to reflect Gilliam's accurate ADC number: 177621. *See Doc. 73.*

## I.   Introduction

On May 16, 2019, Plaintiff Richard Gilliam ("Gilliam") initiated this § 1983 action by filing a *pro se* Complaint. *Doc.* 2. He later filed an Amended Complaint (*Doc. 9*) and a flurry of other unsigned submissions, amendments, addenda, declarations, notices, and untitled papers (*Docs. 15, 19, 20, 23, 24, 27, 29*). On September 6, 2019, the Court entered an Order (*Doc. 30*) striking all of those filings, which contained rambling, unrelated, and convoluted claims about how Gilliam's constitutional rights have been violated since he has been a pretrial detainee in the Lonoke County Detention Center ("LCDC").

The Court's September 6 Order directed Gilliam to file a Substituted Complaint that "included *only allegations that are factually and legally related* to his claims about being placed in administrative segregation on May 2, 2019, and the conditions to which he was subjected thereafter." *Doc. 30 at 5–6*. Gilliam then filed *two* Substituted Complaints. *Doc. 31; Doc. 33*.

On January 9, 2020, the Court entered an Order screening Gilliam's Substituted Complaints, which were construed together as constituting his claims. *Doc. 35*. This Order allowed Gilliam to proceed with the following claims:

*(1) Unconstitutional Conditions of Confinement Claims*

Gilliam's conditions of confinement claims begin when he entered the LCDC, on May 2, 2019, and continued through his initiation of this action on May 16, 2019.

During that time, he alleges that Defendants Sheriff John Staley ("Staley"), Chief Deputy Kevin McCoy ("McCoy"), Detective Dean White ("White"), and Jail Administrator Matthew Hodge ("Hodge") placed him in a "heavily modified" administrative segregation cell, where they and Defendant Deputy Steffen ("Steffen") subjected him to the following inhumane conditions of confinement: (1) "unnecessary" padlocks were placed on his cell door and the "beanhole;" (2) the bunks, table and stool were removed from his cell, forcing him to sleep on a three-inch high concrete slab and to write letters and legal work on the floor; (3) dealing with a constantly leaking toilet, shower, and sink; (4) having his cell illuminated by a constant bright light; (5) shutting off his water for long periods, leaving him without a flushable toilet or clean drinking water; and (6) denying him a sleeping mat, blanket, and all clothing for two days.

(2) *Race Discrimination*

Gilliam, who is an African American, alleges that his race played a role in the way he was treated as a pretrial detainee in the LCDC. *Doc. 31 at 4–5; Doc. 33 at 4–6.*

(3) Excessive Force and Retaliation Claims

Gilliam alleges that Defendants Steffen, Deputy Irving ("Irving"), Deputy Daniels ("Daniels"), and Deputy Howard ("Howard") used excessive force during an incident on September 6, 2019. According to Gilliam, these Defendants used this

excessive force (in which he was pepper sprayed and tased) in retaliation for grievances he had filed Steffen, Irving, Daniels and Howard. *Doc. 31 at 7–8*.

Gilliam asserted all of these claims against the Defendants in their individual *and* official capacity.

On December 18, 2020, the Court entered an Order (*Doc. 62*) dismissing all of Gilliam's excessive claims because those claims were dismissed, with prejudice, in a separate § 1983 action. *See Gilliam v. Devore et al*., No. 4:19-CV-704-BRW-JTK (E.D. Ark. Oct. 9, 2019). Accordingly, those claims are no longer part of this action.

On March 2, 2021, Defendants filed a Motion for Summary Judgment (*Doc. 64*), Brief in Support (*Doc. 65*), and Statement of Indisputable Material Facts (*Doc. 66*). Gilliam has filed a Statement of Disputed Facts (*Doc. 70*) and Declaration (*Doc. 71*), along with various supporting documents attached to his Declaration. Thus, Defendants' Motion for Summary Judgment (*Doc. 64*) is joined and ready for decision.[2]

---

[2]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson,* 477 U.S. at 249–50. The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).

## II.  Discussion

**A.    Viewing The Facts In A Light Most Favorable To Gilliam, None of His Alleged Conditions Of His Confinement Claims Rise To The Level of a Constitutional Violation**

The undisputed facts contained in Defendants' Statement of Indisputable Material Facts (*Doc. 66*) establish the following:

1.    Gilliam was initially booked into the LCDC on December 25, 2017 on a capital murder charge. *Id. at ¶ 1*. He may have later been charged with attempted murder and kidnapping. *Id. at ¶ 52*.

2.    Between December 29, 2017 and May 17, 2018, incident reports document Gilliam: ripping a phone pod off the wall; destroying a television in one of the pods; repeatedly threatening bodily harm to jailers ("I'm going to beat you into the floor;" "Wait until I catch your ass on the floor down here;" "I'm gunna slap yo bitch ass"); throwing a golf ball size object at another television, destroying the screen; repeatedly picking, jimmying, or obstructing the electronic lock on his cell door, which allowed him to roam freely throughout his cellblock; repeatedly popping the sprinkler head in his cell as a way to flood the pod; tearing the toilet and sink in his cell away from the wall; pulling the handicap railing off the wall in his cell to use as a weapon; and entering the crawl space above the ceiling in his cell, by breaking and removing a ceiling tile, in an apparent escape attempt. *Id. at ¶¶ 2–19*.

These incident reports make it clear Gilliam was a violent, dangerous, extremely destructive, and generally incorrigible prisoner.

3.      Because of the security problems and damage caused by Gilliam, the LCDC arranged for his transfer to another county jail in May of 2018. After being relocated, Gilliam created "constant problems in both the Pulaski [County Detention Center] and Crawford [County Jail]." This resulted in his return "to [the LCDC] in early May of 2019." *Id. at ¶¶ 27–29.*

4.      After learning Gilliam would be returning to the LCDC, Sheriff Staley, McCoy, White, and Hodge planned and implemented special modifications to a cell in the segregation unit which was designed to prevent Gilliam from engaging in the kind of destructive and dangerous misconduct that led to his transfer. All of these modifications were "based on Gilliam's [prior] behavior and serious acts of destruction of property" and were "necessary…to best ensure his safety and that of other detainees and officers." *Id. at ¶ 30.*

5.      The modifications to Gilliam's cell were as follows:

(a)      Additional hasps and padlocks were placed on the "frame of the cell door and bean hole to prevent Gilliam from being able to reach or manipulate the electronic security locks," and escape from his cell. *Id. at ¶ 34.*

(b)    An additional external lock was added to secure the door and beanhole in Gilliam's cell. The keys to those locks were maintained by the supervising officer on each shift. *Id. at ¶ 35.*

(c)    To prevent Gilliam from flooding his cell by clogging the toilet with his clothing and bedding, manual valves in the plumbing closet were located so they could be used in the event it became necessary to turn the water off in his cell. If it became necessary to temporarily turn off the water in Gilliam's cell for intervals of time, those same valves could be used to turn the water back on "during the hourly jail checks" so that, *under the supervision of guards*, Gilliam could "flush the toilet and…fill his drinking cup in the sink." *Id. at ¶ 37.*

(d)    To limit Gilliam access to the ceiling, where he previously had attempted an escape, the bunk bed in the cell was removed and a concrete bunk was installed. *Id. at ¶ 48.*

(e)    The table and stool in his cell were removed so he could not stand on them to reach and pop the sprinkler head to flood his cell. *Id. at ¶ 49.*

(f)    All attachments to the walls of his cell were removed to prevent him from breaking them off and using them as weapons. *Id. at ¶ 50.*

(g)    "To protect Gilliam from hurting himself, destroying his cell, or attempting to escape," Defendants installed a "low-intensity light" that "only had enough light [to allow] the officers [on rounds] [to] see [Gilliam] and what he was doing in his cell." *Id. at ¶ 51.*

6.    After Gilliam returned to the LCDC, on May 2, 2019, these modifications lessened but did not stop him from resuming his destructive, violent, and disruptive behavior, as evidenced by the following grievances and incident reports:

(a)    On June 2, 2019, Gilliam submitted a request asking: "why my water has been turned off?" A staff member responded: "You threatened to flood your cell. Your water has been turned back on." *Id. at ¶ 63.*

(b)    Over the next four months, Gilliam filed dozens of grievances, all of which received responses and most of which Gilliam appealed. Those grievances raised a host of complaints ranging from a reoccurring request to have the additional locks removed from his cell door; complaints about being served cold food; complaints about not having hot water for showers; complaints about the toilet, sink, and shower in his cell leaking; "excessive searches of his cell;" periodically no receiving medication for his blood pressure; and generalized

complaints that his special housing arrangements in the segregation unit were implemented because of his race, rather than as a reasonable response to his long history of destructive, dangerous, and incorrigible behavior while detained at the LCDC.

(c)    By August, Gilliam was using his grievances to engage in good-natured banter with the jailers. For example, in his appeal of the denial of his grievance complaining about being served a cold breakfast on a cold food tray, he stated the following:

> I have gotten over 60 different lies over this "hot water" [issue]…cold coffee, cold showers, cold trays, it's a COLD a$$ world…One thing I can say about Sheriff Staley, he is gonna speak his mind, he don't give a damn about what anybody thinks. And he ain't gonna lie to you either…Nevertheless, I am thankful to be back at the jail…and settling in… :) Berryman…is a confused white guy. With no determination and no destination. He's good people tho…I am also requesting [you] to send Deputy Clark, once a week, because he is my favorite deputy and he is a real sh*t talker. It is hard to find people with a good sense of humor in a place like this…I will also like for the jail to have some wax on the floor. It will look better, and make us feel better about taking care of it. Staley approved for us to get a TV this past week. I promised I ain't gonna bother this one…I am gonna wrap it up with this: At times sh*t is real, at times sh*t is fun, but at no point is this sh*t real fun.

*Id. at ¶ 104.*

Although Gilliam filed a "Statement of Disputed Facts" (*Doc. 70*) and sworn "Declaration" (*Doc. 71*) stating his version of the relevant events, he does not

directly dispute any of the foregoing facts.[3] Accordingly, the Court may consider those facts to be undisputed. *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56.1(c).

As a pretrial detainee, Gilliam's conditions of confinement claims must be analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause that applies to the claims of convicted prisoners. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).[4]

In *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 908–09 (8th Cir. 2020), the Court held that an "objective" standard governs whether the conditions of a pretrial detainee's confinement violate his due process rights. To satisfy this legal standard, the conditions of confinement, viewed in a light most favorable to the detainee, must

---

[3] Furthermore, Gilliam seems to acknowledge his violent and disruptive behavior, as described in Defendants' Statement of Indisputable Material Facts: "I want it duly noted for the record that all of the said incidents that Defendants allege that I was being a threat to the order, safety and security of this facility were all under the previous Jail Administrators." *Doc. 70 at 5*.

He also describes himself as a "person who is promoting peace and safety and order." *Id. at 8*. Finally, Gilliam filed affidavits from several other inmates (*Doc. 68; Doc. 72*), who Gilliam swears were not "forced, coerced, threatened, manipulated, or lied to in any manner." *Doc. 70 at 8*. Nothing in the broad and conclusory statements contained in Gilliam's response papers is enough to create a genuine dispute about any of the material facts contained in Defendants' Statement of Indisputable Material Facts.

[4] A pretrial detainee's burden of demonstrating a Fourteenth Amendment violation is "lighter" than what a convicted prisoner must prove to establish an Eighth Amendment violation. *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010); see also *Bell*, 441 U.S. at 535 n.16 (1979) (explaining that "[d]ue process requires that a pretrial detainee not be punished," while an inmate who has been convicted and sentenced "may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment").

amount to "punishment" of the detainee before he has been adjudged guilty of any offense. *Id.* at 909.

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court explained that a pretrial detainee may be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37. Accordingly, the Court held that a pretrial detainee must show either "an expressed intent to punish on the part of detention facility officials" or conditions in the facility that are "excessive" and not reasonably related to a "legitimate government objective." *Id.* at 538–39. Thus, to implicate the due process clause, a detainee must show he was forced "to endure genuine privations and hardship over an extended period of time." *Id.* at 542.

In this case, Gilliam alleges that, after his return to the LCDC on May 2, 2019, he was placed in a modified cell in a segregation unit where, for the next fifteen days (until he initiated this action on May 16, 2019), he was allegedly subjected to what he believes were the unconstitutional conditions of confinement. *Doc. 2*. With respect to pretrial detainees, deprivation of their rights while detained must be reasonable related to a legitimate governmental purpose. *Green v. Baron*, 879 F.2d 305, 309 (8th Cir. 1989). Practices which are: punitive in intent; not rationally related to a legitimate purpose; or rationally related, but excessive in light of their purpose, are unconstitutional. *Johnson-El*, 878 F.2d at 1048.

"An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." *Robles v. Prince George's Cty.*, 302 F.3d 262, 269 (4th Cir. 2002) (internal citations and punctuation omitted). In *Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002), the Court explored the contours of the nexus between the "governmental intent" and the "challenged restriction":

> A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," nor does it require showing a "least restrictive alternative." Otherwise, every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Moreover, it does not matter whether we agree with the defendants or whether the policy in fact advances the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Valdez*, 302 F.3d at 1046.

In *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002), the Court recognized that placing a prisoner in administrative segregation for "managerial reasons," does *not* implicate "due process" concerns:

> A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less. But no process is required if he is placed in segregation not as punishment but for managerial reasons. Suppose for example that the only vacant cell left in the jail was in the segregation ward when a new prisoner arrived; placing him in that cell would be a managerial decision. Or suppose…that a prisoner was placed under particularly restrictive conditions of confinement at the jail because he was considered a suicide risk. Again, no hearing would

be required. Ditto if he was placed in segregation to protect himself from other prisoners, or to protect jail staff from his violent propensities. As long as the purpose was indeed preventive rather than a punitive one, he would not be entitled to notice and a hearing…In none of these cases would a hearing be practicable, or even useful, because managerial decisions do not have the character of rulings applying legal standards to facts, the kind of rulings for which adjudicative hearings are designed.

*Id.* 286 F.3d at 438.

The undisputed facts establish that all of Gilliam's complaints about his conditions of confinement in a specially modified cell in administrative segregation relate to reasonable measures implemented by Defendants for legitimate penological interests directly related to controlling Gilliam's long and well-established history of destroying property, fashioning weapons, threatening guards with bodily harm, fighting with other prisoners, attempting to escape and routinely managing to unlock his cell door and roam around his cell block. In short, the changes Defendants made to safely accommodate Gilliam's return to the LCDC, on May 2, 2019, were rationale and proportional to the need to control known dangers and risks that he otherwise would create if those measure were not implemented.

Gilliam's six specific conditions of confinement claims are discussed below.

### 1. <u>Installation of Additional Padlocks on Gilliam's Cell Door and Beanhole</u>

During his first period of confinement in the LCDC, Gilliam opened the food tray slot ("the beanhole") as part of his technique for defeating the electronic lock

on his cell door, which he was able to do with alarming frequency. To prevent this from happening again, Defendants installed a padlock on the beanhole and another padlock on Gilliam's cell door in the segregation unit. After his return to the LCDC on May 2, 2019, it appears these additional padlocks kept Gilliam in his cell. This may explain why he complained so vociferously about the "additional padlocks" on his cell.

Nothing about the use of these additional locks was punitive *or rose to the level* of an unconstitutional condition of confinement. Furthermore, all of these additional measures were rationally related to the security risk that Gilliam otherwise posed to the safety of guards and other prisoners.

### 2. Removal of Bunks, Table and Stool in Gilliam's New Cell In The Segregation Unit

Gilliam previously had used the table and stool to reach a sprinkler head that he repeatedly popped to flood his cell. He had used his bunk to gain access to the crawl space in the ceiling where he was found hiding in an apparent escape attempt. To prevent this serious and dangerous misconduct from happening again, the bunks, table, and stool were removed from Gilliam's cell and a low concrete sleeping platform was installed.

Nothing about these measures was punitive or rose to the level of an unconstitutional condition of confinement. Finally, all of those measures were

rationally related to the security risk Gilliam otherwise posed to the safety of guards and other prisoners if those items had remained in his cell.

### 3. Gilliam's Complaints About A Leaking Toilet, Leaking Sink, Leaking Shower, And Being Denied Access To Running Water for Short Intervals of Time

Defendants' Statement of Indisputable Material Facts contains Gilliam's grievances complaining about periodic leaks from his sink, shower, and toilet. The responses to those grievances make it clear those leaks will be fixed if Gilliam submits a request for maintenance.[5] *Doc. 66 at ¶¶ 82, 84, 87, 88, 90, 96, 102*. While Gilliam emphasizes the frequency of these leaks, he fails to mention the fact those leaks were all later repaired. Nothing about these leaks suggests they were punishment or that any of the Defendants were deliberately indifferent to the need to have those leaks repaired. Furthermore, Gilliam has come forward with no facts demonstrating that these periodic leaks amounted to an unconstitutional condition of confinement, *i.e.*, their duration and magnitude were so great that it deprived him "of the minimal civilized measures of life's necessities." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010) (quoting *Owens v. Scott Cty. Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003)).

---

[5] Given his penchant for destroying and damaging fixtures in his cell, it is possible these frequent leaks were willfully caused by Gilliam.

Finally, the duration of those leaks, may have resulted in water—but not feces or urine—sometimes being on the floor of Gilliam's cell. However, nothing suggests it remained there for more than a day or two before the leak was repaired. Under a long line of Eighth Circuit cases, nothing about these periodic leaks rises to the level of an unconstitutional condition of confinement. *See Smith v. Copeland*, 87 F.3d 265, 268–69 (8th Cir.1996) (no constitutional violation where pretrial detainee's toilet overflowed for four days); *Frye v. Pettis Cty. Sheriff Dep't*, 41 F. App'x 906, 907 (8th Cir. 2002) (no constitutional violation where pretrial detainee was subjected to foul water and sewage from his leaky toilet for ten weeks, but jail officials provided him towels to absorb the water and had a plumber attempt to fix the leak); *Goldman v. Forbus*, 17 F. Appx. 487 (8th Cir. 2001) (unpublished) (no constitutional violation where pretrial detainee slept six nights on floor next to toilet).

### 4. <u>Light Installed to Illuminate Interior of Gilliam's Cell</u>

As previously explained, before Gilliam returned to the LCDC, Defendants installed a low intensity light to ensure guards making rounds could be see inside his cell. Defendants Statement of Indisputable Material Facts states that, during his initial period of incarceration in the LCDC, Gilliam would use bedding or clothing to cover the lights in his cell to prevent guards from seeing inside. Gilliam had previously tried to escape by hiding in the crawl space above the ceiling in his cell. He also had fashioned weapons from objects in his cell, and repeatedly picked or

otherwise defeated the electronic lock on his cell door. All of that undisputed conduct by Gilliam created a compelling reason to install a light to illuminate the interior of his cell. The purpose for that light was directly and reasonably related to the LCDC's legitimate penological interest in ensuring the safety of guards and detainees in that area of the facility, and preventing Gilliam from fashioning a weapon or making another attempt to escape through the ceiling crawl space.

While Gilliam's allegations make it clear that he was bothered by the 24-hour illumination of his cell, he has not alleged, much less demonstrated, how it caused him any physical injury, or otherwise resulted in any issues requiring medical attention. Finally, because it was a low intensity light, Gilliam was free to turn his back to the light when he slept or use his blanket to cover his eyes.

Accordingly, Gilliam has failed to demonstrate that Defendants' installation of this light created an unconstitutional condition of confinement or that Defendants' motivation for installing it was to punish him, instead of for legitimate penological reasons that were justified by Gilliam's prior conduct and actions during his initial period of confinement in the LCDC.

## 5. **Defendants' Temporary Restriction of Running Water to Gilliam's Cell**

Gilliam makes the conclusory allegations that water was shut off to his cell "for long periods of time." Defendants' Statement of Indisputable Material Facts makes it clear that the water was temporarily shut off to Gilliam's cell after he stuffed

clothing and other items in the toilet and then repeatedly flushing it to flood his cell. *Doc. 66 at ¶¶ 36–39*. Furthermore, while the time water was cut off to his cell after this incident, "at each hourly jail check, officers…turn[ed] on the water [long enough] to allow Gilliam to flush his toilet and to fill his drinking cup in the sink." *Id. at ¶ 41*.

Thus, while the water in Gilliam's cell was temporarily cut off, he was still provided periodic access to water, under supervision of guards conducting hourly jail checks. During those periodic cell checks, Gilliam was allowed to flush his toilet, drink water from the sink, and fill up his drinking cup before the water was turned off until the next cell check.

Restricting water to Gilliam's cell was directly related to preventing him from flooding his cell. Because he was allowed access to water during regular short intervals of time, followed by intervals of time when the water was turned off, nothing about those facts rises to the level of an unconstitutional condition of confinement. *See Williams v. Delo*, 49 F.3d 442, 444 (8th Cir. 1995) (no constitutional violation where pretrial detainee's water was turned off and detainee could not flush toilet or wash hands for four days); *see also Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (finding the *length of time* a pretrial detainee is subject to conditions to be a "crucial factor" in determining whether a constitutional violation has occurred).

6.  **Defendants' Removal of Gilliam's Sleeping Mat, Blanket, And All Clothing For Two Days**

After returning to the LCDC on May 2, 2019, Gilliam on at least one occasion used his clothing to clog his toilet and flood his cell.[6] This resulted in all of his clothing, sleeping mat, and blanket becoming water soaked, which required those items to be removed from his cell to be cleaned and dried. In the interim, Defendants ~~did not provide~~ given Gilliam with replacement clothes and a blanket because of legitimate concerns he would use those items to again flood his cell. The two-day cooling off period before returning those items to Gilliam appears to have worked because, after he received the freshly laundered and dried items back, he did not use them again to flood his cell.

Accordingly, Gilliam has failed to demonstrate how being without clothing, a blanket, and a sleeping mat for two days (because *his* incorrigible behavior created the need for these items to be removed from his cell) deprived him "of the minimal civilized measures of life's necessities." Thus, Gilliam has failed to demonstrate that Defendants' actions rose to the level of a constitutional violation.

7.  **Totality of the Circumstances**

Consistent with the Court's holding in *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902 (8th Cir. 2020), the Court has carefully considered all of Gilliam's

---

[6] It appears this may have been the *same incident* that lead to the water in Gilliam's cell being temporarily cut off, as previously discussed in Gilliam's fifth conditions of confinement claim.

conditions of confinement claims *together* to determine if the totality of Defendants'
actions created unreasonable or punitive conditions of confinement that rose to the
level of a constitutional violation. *Id.* at 909; *see also Howard v. Adkison*, 887 F.2d
134, 137 (8th Cir. 1989) ("Any analysis of confinement conditions must be based on
the totality of the circumstances."). Both standing alone and considered together,
Defendants' modifications of Gilliam's cell and their actions to control his violent,
dangerous and disruptive behavior were all reasonably related to legitimate and
important penological interests; designed to protect the safety and welfare of guards
and other inmates who had contact with Gilliam; and to maintain institutional
control.

Accordingly, Defendants are entitled to summary judgment on all of Gilliam's
conditions of confinement claims.

### B.    Gilliam's Conclusory Claims of Race Discrimination

Gilliam makes the conclusory allegation that the conditions surrounding his
special housing in the LCDC were imposed because of his race. However, Gilliam
has come forward with no facts supporting this claim. Because the undisputable facts
establish that Gilliam's own violent, dangerous, and destructive behavior in the
LCDC—*not his race*—required the imposition of the special conditions giving rise
to his conditions of confinement claims, his conclusory and factually unsupported
claims of race discrimination seems to have been made as an afterthought.

It is Gilliam's obligation to support his claims of race discrimination by providing facts demonstrating that Defendants treated a white prisoner, *similarly situated to Gilliam*, in a disparate way. In his Statement of Disputed Facts, Gilliam mentions an inmate who "kicked his cell door open and punched a deputy in the face." *Doc. 3 at 8*. He alleges that this inmate was "free to walk around for 2 days until the [Jail Administrator] was notified and then the inmate was dealt with." *Id.* He also mentions "an inmate with the exact same change as [him] [but] wasn't locked down in a cell with padlocks on the door and beanhole." Id. Gilliam does not state the race of either of these inmates and does not (and likely cannot) show that either of these inmates had the same voluminous history of destructive and incorrigible behavior as him. Accordingly, Gilliam has not come forward with any of the facts necessary, at the summary judgment stage, to support the race discrimination claim he has asserted against Defendants.[7]

Accordingly, Defendants are entitled to summary judgment on Gilliam's claim of race discrimination.

---

[7] Defendants' Statement of Indisputable Material Facts makes it clear that Gilliam's race played no role in the way he was treated as a pretrial detainee. Further, Defendants have asked the Court to take judicial notice of the facts in *Voss v. Staley*, No. 4:20-CV-219-BD (E.D. Ark. Feb. 28, 2020), in which Ramey Voss, a Caucasian prisoner in the LCDC, made similar complaints about additional padlocks being placed on his cell door and having to deal with similar unsanitary conditions. The Court in that case rejected Voss's claims and granted summary judgment in favor of Defendants.

**C.    All of Gilliam's Official Capacity Claims Against Defendants Should Be Dismissed**

In *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985), the Court recognized that "an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." This means that an official capacity claim against a county official or employee is the equivalent of a suit against the county itself. *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998). Thus, Gilliam's official capacity claims against Defendants are actually claims against Lonoke County, which can only be held liable if the Defendants' actions giving rise to Gilliam's claims were taken pursuant to an unconstitutional custom, practice or policy of Lonoke County. *Doe By & Through Doe v. Washington Cty.*, 150 F.3d 920, 922 (8th Cir. 1998) (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978).

In Defendants' Statement of Indisputable Material Facts, at paragraphs 115 through 121, the relevant policies of the LCDC are described. Because all of those policies are facially constitutional, Gilliam has made no showing that those policies were enacted by Lonoke County "with deliberate indifference to the known or obvious consequence" that, as applied, they would lead to constitutional violations. Rather, all of Gilliam's claims and allegations are against the individual Defendants for the way they exercised their own judgment and discretion in taking the actions that Gilliam alleges violated his constitutional rights.

Perhaps most importantly, none of the Defendants violated Gilliam's constitutional rights. Absent a constitutional violation by Defendants in their individual capacities, Lonoke County cannot be held liable for Defendant's *constitutional* actions, even if those actions were taken pursuant to a custom, practice, or policy of Lonoke County. *Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019); *Schoettle v. Jefferson County*, 788 F.3d 855, 861–62 (8th Cir. 2015) ("We have long held that neither municipal nor supervisory liability may attach in section 1983 actions unless individual liability is first found on an underlying substantive claim.")

Because Gilliam has come forward with no facts to support his claims of official capacity liability against Lonoke County, all of those official capacity claims should be dismissed, without prejudice.

### III. Conclusion

Given the totality of the circumstances surround Gilliam's conditions of confinement claims, he has failed to demonstrate that the conditions he encountered in the LCDC on, or after, May 2, 2019, rose to the level of a constitutional violation. Similarly, Gilliam has come forward with no facts to support his entirely conclusory claim that his race was the reason the special housing conditions were imposed after he returned to the LCDC in early May of 2019.

Accordingly, the Court should grant Defendants' Motion for Summary Judgment (*Doc. 64*), and all of Gilliam's claims against the Defendants should be dismissed, with prejudice.

DATED this 25th day of February, 2022.

_____
UNITED STATES MAGISTRATE JUDGE